

In The
Court of Appeals
Seventh District of Texas at Amarillo

_____

No. 07-20-00183-CR
_____

DUSTIN AARON HUBBARD, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 35th District Court
Mills County, Texas
Trial Court No. 3379, Honorable Stephen Ellis, Presiding

February 11, 2021

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Dustin Aaron Hubbard appeals his conviction for delivering a controlled substance. Five issues pend for review. Upon considering them, we affirm the judgment.

*Issue One – Sufficiency of the Evidence*

We begin with appellant's contention that the evidence was legally insufficient to support conviction. Allegedly, the State failed to prove he delivered the controlled substance as either the primary actor or as a party. We overrule the issue.[1]

---

[1] Because this appeal was transferred from the Third Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

The standard of review we apply here is that discussed in *Braughton v. State*, 569 S.W.3d 592 (Tex. Crim. App. 2018). Next, a person commits an offense if he knowingly delivers a controlled substance. TEX. HEALTH & SAFETY CODE ANN. § 481.112(a) (West 2017). Delivery means to transfer, either actually or constructively, a controlled substance to another person. *Id.* § 481.002(8) (West Supp. 2020). Culpability may be either as the primary actor or a party to the act of another. Regarding the latter, one is criminally responsible for an offense committed by another if, while acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person commit the crime. TEX. PENAL CODE ANN. § 7.02((a)(2) (West 2011). That said, we turn to the evidence of record.

The transaction at bar involved a sting. That is, an informant was asked to acquire methamphetamine and marijuana on behalf of law enforcement officials. He began that endeavor by calling Dotson and informing her that it was his birthday, he wanted to celebrate it with drugs, did not want to search for them himself, and asked if she would do it for him. While discussing the transaction on the phone, Dotson agreed and offered to leave "collateral." The offer of "collateral" was made to assure her bona fides as she planned to take the informant's money prior to beginning her search. Appellant was among the items of "collateral" offered by Dotson.

Eventually, Dotson arrived at the informant's apartment. Accompanying Dotson were appellant and Griffin. The informant gave Dotson money, and Dotson, along with appellant and Griffin, left. Instead of leaving appellant behind, she allowed the informant to hold her cell phone as collateral. The three returned several hours later, entered the apartment, sat across from the informant, and started discussing the drugs acquired. All

2

present spoke at one time or another during the negotiations. And, during their verbal exchanges (which a law enforcement officer described as "conducting a drug deal"), Dotson handed appellant a baggie containing what appeared to be a white substance. Appellant held it momentarily then handed it back to Dotson, who then passed it to the informant. At that point, law enforcement officers hiding in the apartment effectuated arrests of those present. They also seized two bags containing a white powdery substance (methamphetamine), one of which was that handed to and possessed by appellant. Finally, in a post-arrest interview, appellant described how the group travelled to Brownwood to acquire the drugs from a person named Jason Brown.

It is clear that Dotson arranged for the acquisition of the drugs and directly handed them to the informant once acquired. Yet, appellant was present when the informant gave Dotson the money to buy the drugs, was offered-up as collateral to assure Dotson's performance, was privy to the conversation between Dotson and the informant since he wished the informant a happy birthday, travelled with Dotson to the location at which the drugs were bought, knew the identity of the person from whom they were acquired, returned with Dotson to the informant's apartment, spoke during the drug negotiations, and physically held the drugs before they were passed to the informant. Moreover, an officer testified that it was not unusual for female dealers to take males with them for protection when transacting drug deals. Given this, the jury had before it some evidence upon which it could rationally conclude that appellant, acting with intent to promote or assist the drug sale, aided or attempted to aid Dotson commit the crime. His involvement was more than just mere presence, contrary to his suggestion otherwise.

*Issue Two – Confrontation Clause*

Next, appellant complains that he was denied the right to confront witnesses when the trial court admitted into evidence the drug analysis report. His right was so denied because the individuals who actually conducted the analysis were not called to testify, but rather a surrogate was called in their stead. We overrule the issue.

The purported surrogate was the person who signed the actual report, i.e., Deiss. It was generated after other analysts performed the legwork of removing a quantum of substance from the baggies and placing it in the machines that conducted the analysis. The process utilized by the machines generates waveforms, which waveforms the machine memorializes and compares to a library of known waveforms. Different drugs have different waveforms and comparing the generated waveforms to the library of known ones identifies the particular controlled substance involved. Rather than simply rely on the machine generated match, Deiss undertook her own comparison of the waveforms generated by the machine to the library of known waveforms. Through it she confirms the accuracy of the machine's assessment, checks the steps undertaken to obtain the waveforms, and executes the ultimate report. This process likens to that used in *Paredes v. State*, 462 S.W.3d 510 (Tex. 2015).

DNA instead of drugs was being analyzed in *Paredes.* And the analyst issuing the report in question did so after conducting an independent review of raw data generated by a computer. Though others were involved in preparing the blood sample and inserting it in a machine (computer) that performed the actual analysis, the computer itself simply generated raw data that the testifying expert had to analyze to form the opinion within the ultimate report. The *Paredes* court observed that the Confrontation Clause does not mandate that everyone whose testimony may be relevant in establishing the chain of

4

custody, the authenticity of the sample, or the accuracy of the testing device must actually testify. *Paredes*, 462 S.W.3d at 518 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 n.1, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009)). It also distinguished the situation before it from those where the testifying expert simply relies on conclusions from another analyst's report in forming his or her own conclusion. *Id.* Instead, the testifying expert in *Paredes* reviewed raw data generated by the computer and extrapolated an opinion from it. *Id.* That independent analysis of raw data by the testifying expert removed the circumstances from the throes of the Confrontation Clause. That raw data was not the functional equivalent of live testimony, according to the court, because it "did not come from a witness capable of being crossed-examined" but "from a computer." *Id.* at 519. The same is no less true here.

Though humans were involved in preparing the substance for analysis, the analysis was done by a machine. That machine derived raw data, i.e., waveforms, which were independently compared to known waveforms of specific controlled substances. Deiss conducted that independent comparison after checking upon the propriety of the steps leading to the machine developing the raw data. So, like the trial court in *Paredes,* the trial court at bar also had before it a testifying expert whose report was derived by independent analysis of raw data generated by a machine. Consequently, we have no basis to conclude that the trial court abused its discretion in overruling the Confrontation Clause objection directed at Deiss's report. *Colbert v. State*, No. 03-17-00558-CR, 2019 Tex. App. LEXIS 1720, at *6 (Tex. App.—Austin Mar. 7, 2019, pet. ref'd) (mem. op., not designated for publication) (applying the abuse of discretion standard to review a decision overruling a Confrontation Clause objection).

5

*Issue Three – Charge Error*

Next, appellant asserts that the trial court erred in failing to define "with intent" in the jury charge. We overrule the issue.

No one objected to the absence of the definition. Assuming *arguendo* that the definition was law of the case necessitating definition, its omission was reversible only if appellant suffered egregious harm. *Chambers v. State*, 580 S.W.3d 149, 154 (Tex. Crim. App. 2019). Such harm occurs when the default deprived the appellant a fair and impartial trial. *Id.*; *accord Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020) (stating that one suffers egregious harm when the omission affects the very basis of the case, deprives the defendant of a valuable right or vitally affected a defensive theory). We conducted the requisite valuation here and cannot conclude that the omission affected the very basis of the case or otherwise denied appellant a fair and impartial trial.

As previously mentioned, ample evidence supported a finding that appellant acted, at the very least, as a party to the delivery. He was offered up as collateral by his compatriot as she sought to complete the transaction, knew of Dotson's purpose, went with her on a multi-hour drive to secure the drug, participated in the negotiations while seated inside the apartment, possessed the drug before giving it to Dotson for actual delivery to the informant, and even wished the informant a happy birthday. Appellant knew the plan, travelled with Dotson to effectuate it, and was actually a link in the chain of delivery to the informant. We have no doubt that he aided in the commission of the crime with the conscious desire or objective to assist Dotson commit the crime. *See* TEX. PENAL CODE ANN. § 6.03(a) (West 2011) (stating that a person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result). So, omitting

6

the definition of "with intent" from the charge did not deprive him of a fair trial by allowing the jury to convict him as a party without the requisite evidence of intent to assist. The jury may not have been told what "intent" meant but they nonetheless had the requisite basis to find his actions were coupled with such intent.

*Issue Four – Charge Error*

Appellant next complains of supposed charge error by contending that the trial court's reference to direct and circumstantial evidence were comments on the weight of the evidence. We overrule the issue.

The alleged error consisted of the trial court stating in its charge that 1) a "fact may be established by direct evidence or by circumstantial evidence, or both"; 2) a "fact **is** established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken"; and, 3) a "fact **is** established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved." (Emphasis added). Like the alleged charge error addressed in the previous issue, this one too appeared without complaint by anyone. Thus, it is reversible only if it denied appellant a fair and impartial trial, *Chambers*, *supra*, or affected the very basis of the case. *Gonzalez*, *supra*. It did neither. Indeed, a like instruction was found to be nothing more than a "mild, neutral, and an obvious common-sense proposition." *Barron v. State*, No. 08-12-00184-CR, 2016 Tex. App. LEXIS 8811, at *24 (Tex. App.—El Paso Aug. 12, 2016, pet. ref'd) (not designated for publication) (quoting *Brown v. State*, 122 S.W.3d 794, 803 (Tex. Crim. App. 2003)). This was especially so because the instruction was accompanied by another informing the jurors that they were the exclusive judges of the facts proved, the credibility of the witnesses, and the weight to be given the testimony.

*Id.* at *22.  Such an additional instruction appeared in the charge at bar.  We find no denial of a fair trial or impact on the very basis of the case; that is, we find no egregious harm.

*Issue Five – Charge Error*

Appellant levied one final attack upon the charge.  It concerned another purported comment on the weight of the evidence.  We overrule the issue.

The supposed comment occurred when the court charged the jury that 1) "[w]hile you should consider only the evidence, you are permitted to draw reasonable inferences from the testimony and exhibits that are justified in the light of common experience"; and 2) "[i]n other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the evidence."  The Austin Court of Appeals, whose precedent we must follow, considered a like argument, *viz.,* a like instruction and held its inclusion was not error.  "[T]hese instructions are not 'special instructions' and do not focus the jury's attention on a specific type or piece of evidence that may support an element of the offense."  *Lerma v. State*, No. 03-18-00578-CR, 2020 Tex. App. LEXIS 2478, at *8 (Tex. App.—Austin Mar. 26, 2020, pet. ref'd) (mem. op. on reh'g, not designated for publication).

We affirm the judgment of the trial court.

Per Curiam

Do not publish.